## MURPHY *v.* THE COMMISSIONERS OF EMIGRATION.

The commissioners of emigration not being engaged, or interested in, the transportation of passengers or baggage, or in the care of baggage after it is landed, and having no agents who are so engaged, are not responsible for the loss of baggage delivered by an emigrant, on board a ship in the harbor of New York, to the crew of a tug boat, to be transported to Castle Garden.

The licensing of the owners or captains of steamboats &c. to receive and land passengers and their baggage, and of persons to solicit emigrant passengers, and baggage, for boarding houses and transportation lines, by the commissioners of emigration, does not make the licensed persons the agents of the commissioners, or render the latter responsible for their good conduct.

THIS action was brought in the Court of Common Pleas of the city of New York, to recover the value of a trunk and its contents, which it was claimed were delivered to the

defendants, on ship board in the harbor of New York, on the plaintiff's arrival at that port, in the ship Ontario; which trunk the defendants undertook to forward to their place of business at Castle Garden; and it is alleged that the trunk and its contents, of the value of $1290, were lost by the defendants, and judgment demanded for that sum.

The defendants denied that they received the box or its contents, and alleged that they were public officers of the state of New York, whose powers and duties were defined by statute, and they denied that they had any other powers, or that emigrants were landed at Castle Garden, or baggage taken or deposited there, by the defendants, or by any one by their authority, or on their behalf; or that they employed agents or servants to do so.

It appeared on the trial, that the plaintiff, in August, 1857, came as a passenger on the ship Ontario to New York, and brought three boxes or trunks, containing baggage; that a tug boat came alongside of the ship in the harbor, and persons on board put strap checks on the trunks, gave the plaintiff the checks, and the trunks were put on board the tug boat, and taken to Castle Garden. The plaintiff subsequently obtained two of her trunks, but the other was missing, and could not be found. At one time when she called to make inquiries concerning it, Mr. Kennedy, one of the commissioners of emigration, was there, and he took the check and refused to return it to her, and put her out of the garden.

The commissioners of emigration, composing a board of ten persons, was organized in 1847, to provide for the support and maintenance of indigent emigrants. By subsequent statutes they were authorized to designate a place in the city of New York where emigrants should be landed; to purchase, lease, construct and occupy wharves, piers and other accommodations, in the city of New York, for that purpose; to license the owners or captains of steamboats and other craft; to receive and land passengers and their baggage;

and to revoke such licenses ; and such persons were prohibited from acting without such licenses.   Like power was given to them to license persons to solicit emigrant passengers and baggage, for boarding houses and transportation lines, &c. and the law required all personal baggage of emigrants to be landed at the place designated by them.   In pursuance of these powers, the defendants designated Castle Garden as the place for the landing of emigrant passengers and their baggage ; and procured an assignment of a lease of the place, to themselves, subject to a reservation by the assignor, of the right to rent such parts of the same as should be required for offices for the sale of tickets, and contracting for the transportation of emigrants and baggage.   They also licensed various steamboat captains and solicitors for boarding houses and transportation lines, and retained the control of the garden, the regulation of its police, &c., but they were not engaged or interested in the transportation of passengers or baggage, and had no agents who were so engaged.

On this state of facts, a motion for a nonsuit was denied, and the defendants' counsel excepted.  The judge then charged the jury that the doctrine of *respondeat superior* was applicable to this case, and that the defendants were the superiors or principals ; to which the defendants' counsel excepted.

The jury found a verdict for the plaintiff for $1288.73, for which 'sum judgment was entered, with costs, after the denial at special term of a motion for a new trial.

On appeal to the court at general term, the judgment was reversed, and a new trial ordered, *on payment of costs to the appellants;* and from that order the plaintiff brought the present appeal, stipulating for final judgment, in case the order shall be affirmed.

*John H. Reynolds*, for the appellant.

I. By their verdict the jury have found that the property of the plaintiff came into the possession of the agents or

employees of the commissioners of emigration, and that it was lost by their carelessness or negligence. Under this finding of the fact, the liability of the defendants is clear, unless there is some special exemption from liability, applicable to them. 1. There is no statute exempting the commissioners of emigration from liability for their own wrongful or negligent acts, or those of their agents or servants. They may be under no duty to look after the baggage of emigrants, but if they do undertake it they must perform the duty with fidelity, and if they do not they are liable. 2. The case clearly shows that the immediate agents of the defendants took charge of the plaintiff's property, and through them it was lost. Mr. Kennedy in fact converted it by retaining the check, and driving the plaintiff away from Castle Garden, and he was a commissioner of emigration and then general superintendent.

II. By the act of 1855, (chapter 474, §§ 6, 7,) the commissioners of emigration are authorized to designate the place in the city of New York for the landing of emigrants, and also may purchase, lease, construct and occupy such wharves, piers and other accommodations in the city of New York as may be necessary for the accommodation of emigrant passengers. 1. It will be seen by an examination of this statute that the *duties* to be performed with respect to emigrants is confided to the commissioners of emigration. They are to *occupy* the wharves and piers for that purpose, and it does not appear that they are authorized to surrender these duties to the employees and runners of rail road companies, and thus throw off all responsibilities for the performance of the trust imposed. 2. In pursuance of the statute of 1855, the commissioners of emigration designated Castle Garden as the place for landing emigrants, and took an assignment of a lease of the premises for that purpose, and it does not alter the question of their liability that they have given for convenience, or otherwise, certain privileges to various rail road companies. Public officers, who are charged

with and accept public duties in the performance of which individual rights may be affected, are not excused from liability if individuals suffer, because they have improperly delegated to others, duties which they ought themselves to have properly performed. 3. The case shows that all the operations at Castle Garden are under the direction of the commissioners of emigration. No agent of a rail road company is there, except by their consent, and by their authority, and all is controlled by their immediate agent and superintendent, and in this case their general agent assumed to give special directions in respect to the baggage lost. 4. If the baggage was lost through the intervention of the rail road agents, it does not change the rule of liability, for these agents are put there by the defendants to discharge their duties. But in fact the agents of the rail road companies had nothing to do with the plaintiff's property. They dealt with the baggage of emigrants going out of the city, and not those intending to remain in New York as the plaintiff did. Hence two classes of checks were used, and the plaintiff had "Castle Garden" checks, which place was governed and controlled by the defendants or their immediate agents, and who in fact assumed dominion over it. 5. But as the defendants are by law charged with the duty of protecting emigrants, they could not, by any act of theirs, create in the rail road companies or their agents a duty, which is so far separate and independent as to shield the defendants from liability to third persons for their misconduct, no matter what claims may arise between the defendants and their employees. And in fact the whole case shows that the defendants have reserved to themselves the full dominion and control of Castle Garden and all persons employed in the landing and protection of emigrants.

III. Although the defendants are public officers and charged with duties which may be considered public in their character, they are nevertheless *ministerial* and not *judicial* duties, and they are liable for any *nonfeasance* or *misfeas-*

*ance* in the line of their duties by which injury happens to individuals. (*Rochester White Lead Co.* v. *City of Rochester*, 3 Comst. 464; *Houghton* v. *Swarthout*, 1 Denio, 589; *Wilson* v. *Mayor &c.*, Id. 595; *Mayor &c.* v. *Furze*, 3 Hill, 612.) 1. The court ruled correctly on the trial that the doctrine of *respondeat superior* applied, and that the defendants as superiors or principals are responsible for the wrongful and negligent acts of their servants. (*Blake* v. *Ferris*, 1 Seld. 48; *Peck* v. *The Mayor*, 4 id. 222; *Stevens* v. *Armstrong*, 2 id. 435; Story on Agency, § 453.) 2. Under the statutes relating to the landing and protection of emigrants, the commissioners of emigration are made the superiors or principals in respect to all that pertains to the performance of the duties imposed, and they can not divest themselves of that relation or responsibility. (Ch. 195, Laws of 1847, § 4; Ch. 474, Laws of 1855, §§ 6, 7.) 3. The object of the provisions of the statute was to prevent emigrants arriving at New York from being robbed of their money and *property*, and it is absurd to say that while they have a duty to perform in respect to the emigrant they have none in respect to his baggage. 4. They are charged with the duty of doing or causing to be done every thing in respect to the emigrant and his baggage and property, that is necessary to safety and comfort, and failing in this they incur a liability. Having taken possession of the plaintiff's baggage, and failing to produce it on reasonable demand, they are responsible for its value.

*John E. Develin*, for the respondents.

The respondents, who are ten in number, are officers appointed pursuant to statute to perform part of the functions of government, and are not a corporation. (Laws of 1847, ch. 195, § 4.) By chapter 474 of Laws of 1855, § 6, these public officers, the respondents, were directed to designate some one place in the city of New York, as the landing

place in the said city for emigrant passengers, and they were by section seven of said chapter also authorized to purchase, lease, construct and occupy such wharves, piers and other accommodations in the city of New York, as might be necessary for the purposes mentioned in the last preceding section. By section one of chapter 579 of the Laws of 1857, the respondents are authorized and directed to license steamboats, to remove and take off emigrant passengers from shipboard, and by section four of said chapter 579, they are also authorized to license persons to solicit passengers for boarding houses, passenger offices, &c. The protection of emigrants from frauds, &c. is a duty imposed upon the civil magistrates, not upon the respondents, except so far as the power to grant licenses is concerned, which is vested in them by the last named law, and in a few cases where they are authorized to sue for and recover penalties incurred. (See chap. 219 of Laws of 1848.) Beyond this, the duties of the respondents, in regard to emigrants, are specified in section four of chapter 195 of the Laws of 1847, and sections six and seven of chapter 474 of the Laws of 1855, above referred to. It will be observed that all the duties of the respondents are imposed, and their powers are conferred by law upon them as officers of the government, and are specified, as follows: 1. To support and maintain indigent emigrants. 2. To designate a landing place in the city of New York for arriving emigrants. 3. To lease and occupy wharves and other accommodations for the convenience of emigrants landed at the wharf which they are directed to designate. 4. To license steamboats to land passengers, and to license emigrant runners. They perform all these duties as the instruments of government; but are not directed or authorized by any statute to take charge of or convey from shipboard, or elsewhere, or in any manner interfere with the baggage of emigrants. By the testimony in this case, it appears that the wharf at Castle Garden was in 1855 designated by the respondents, pursuant to the direction of section six of chapter 474 of Laws of 1855, as the

landing place for emigrants, and that a qualified assignment of the lease of Castle Garden was made to the respondents in that year ; and that the assignor reserved to himself the right to use, occupy and rent so much convenient space in such parts of the premises as shall from time to time be required for offices, for the purposes of renting or permitting the same to be used as offices for the sale of tickets, and for contracting for the transportation of emigrants, and of the luggage of emigrant passengers, and for no other purpose, the dimensions and location of such offices to be regulated by the commissioners of emigration, subject to the approval by them of the rail roads and persons to be admitted into Castle Garden, in other words, to the respondents' license. That this assignor rented to various rail roads the privilege above reserved. That under this renting, and to facilitate their busines, these rail road companies employed steamboats, manned by their employees, to bring off emigrant passengers from ships in the stream ; that the baggage of such emigrants was checked by such employees with rail road checks, and that when landed this baggage was taken in charge by their employees and kept in a baggage house of the rail road companies, still under the control of the rail road employees, and that neither the respondents nor their agents have connection with the landing of the passengers or their luggage, or the care or custody of it, beyond giving licenses as above mentioned.

I. Even though a corporation, the respondents would not have been liable to the appellant in this action under the facts proved upon the trial. The box and contents were never delivered to the respondents or their agents ; but on the contrary, to the employees and agents of the rail road companies having offices in Castle Garden. (Story on Bailment, § 2 ; 1 Parsons on Cont. 569.)

II. As public officers of the state government, the respondents were in no manner liable to the appellant. 1. The respondents were not authorized by the laws of their being

to make any contract for the acceptance, keeping or return of baggage of any person, and consequently, if on the trial any such contract had been established, it would have been *ultra vires,* and no action could be maintained upon it. (See laws above cited concerning powers and duties of the respondents.) 2. On the trial no such contract was proved, nor were there in evidence any facts from which it might have been implied. 3. Public officers of government whose duties compel them, as did the duties of the respondents, to employ and act by agents, are not personally responsible for loss occasioned by the neglect or any acts of the agents thus employed by them. (*Lane* v. *Cotton,* 1 Ld. Ray. 646; *Whitfield* v. *LeDespencer,* Cowp. 754; Story on Bailm. §§ 462, 463.) 4. And they are never liable in their character of representatives of the government; or, in other words, the government is not liable for the neglect or laches of the agents whom it employs to transact the public business. (Story on Agency, § 319; Story on Bailment, § 462; *Seymour* v. *Van Slyck,* 8 Wend. 403, (422;) *United States* v. *Kirkpatrick,* 9 Wheat. 735; *Dox* v. *Postmaster General,* 1 Peters, 318; *Whitfield* v. *LeDespencer,* Cowp. 734.) The respondents are here impleaded in their official character as commissioners of emigration, and the government of the state is, therefore, the virtual defendant.

III. The act of 1847, chap. 195, § 4, provides the fund under the control of the commissioners; directs its disposition, confining the expenditure to the care and maintenance of emigrants, their removal from one part of the state to another, assistance to procure employment for them, and to the purchase or leasing of lands, and erection of buildings necessary for the care and maintenance of emigrants. And the general term of the Common Pleas was therefore correct in not permitting to stand, but reversing, a judgment upon which execution might issue against the property in their possession, appropriated by law to certain specific purposes,

among which is *not* that of paying or reimbursing a person for lost baggage.    (Ch. 195 of Laws of 1847, § 4.)

SELDEN, J.   The motion for a nonsuit in this case should have been granted, and the exception to the charge was well taken.   The proof does not show the defendants were in any way interested in the transportation, or care of the baggage, of the plaintiff, or that it ever came into their possession or under their control.   The licensing of steamboat men and "runners," as they are called in the case, does not make the licensed persons their agents, or render them responsible for their good conduct.   (*Lane* v. *Cotton*, 1 Ld. Ray. 646.)

The ground, however, upon which the recovery below proceeded, was that the defendants were the principals in the transportation of passengers and baggage to the landing place appointed by them, and in taking care of the baggage when landed.   This position can not be sustained.   In the first place, the commissioners of emigration, in their official character, in which character they are prosecuted, have no authority to engage in such business; and if they were, in a body, to overstep the bounds of their official duty and engage in such business, the responsibility which would attach to them in consequence of such business, would affect them as individuals, and not in their official character.   In the second place, there is no evidence that either as a board or as individuals they have been in any way interested in, or connected with, the landing of passengers or baggage, or in the case of baggage after it was landed, or have appointed any agents for that purpose.

The government, in assuming control over the landing of emigrants and their baggage, does not undertake, either by itself or its officers, to indemnify emigrants against fraud, but it has established the regulations, which have been referred to, in the belief, doubtless, that the opportunity to commit frauds would be thereby diminished.   If those regulations have failed to protect the plaintiff, it is a misfortune, for

which she has no remedy against the state or against the defendants. Her remedy is against the persons to whose care she entrusted her baggage, whose fidelity and vigilance the government has endeavored (in this instance unsuccessfully) to secure.

If any of the members of the board have failed in their duty, and the plaintiff has suffered in consequence of such failure, they may be individually liable, but the consequences of individual misconduct, if there were any, could not be visited upon the board.

The order of the general term must be affirmed, and judgment absolute for the defendants ordered, in accordance with the stipulation.

BALCOM, J. Commissioners of emigration were named in the law of 1847, entitled "An act concerning passengers in vessels coming to the city of New York." (Laws of 1847, vol. 1, p. 182.) Section four of that law declares that "the said commissioners shall be known as the 'commissioners of emigration,' and by that title shall be capable of suing and being sued." The same law provides for the filling of vacancies in the office of commissioners, and for the appointment of new ones by the governor, by and with the advice and consent of the senate.

Under the authority conferred upon the commissioners of emigration by sections six and seven of chapter 474 of the Laws of 1855, they designated Castle Garden as the place for the landing of emigrant passengers in the city of New York, and they hired that garden for such purpose. But it was pursuant to chapter 579 of the Laws of 1857, that they licensed the steam tug, by which the plaintiff and her three chests of baggage were taken from the ship Ontario, which brought her into the harbor of New York.

The owners of the steam tug had the right to take the plaintiff and her baggage from the ship Ontario to Castle Garden; and they incurred a penalty if they did not carry

the missing chest to the garden.   (Laws of 1857, p. 243, § 5.) For the evidence shows all three of the chests were put on board the tug.

The plaintiff was not able to find one of the chests in Castle Garden, where all three of them should have been delivered by the owners of the tug.   The one she did not obtain contained the two hundred and twenty sovereigns and property in question in this action.

The judge charged the jury that the doctrine of *respondeat superior* was applicable to the case, and that the defendants were superiors or principals.   Also, that the defendants were liable if the property came into the possession of the agents or employees of the defendants, and was lost by their carelessness and negligence.

The jury must have found that the missing chest was lost or wrongfully detained after the same came into Castle Garden, by the carelessness or negligence of Superintendent Kennedy or some other agent, clerk or servant employed there by the defendants.   For there was no ground for imputing personal carelessness or negligence to either of the commissioners of emigration.

Kennedy and the other persons were employed by the defendants in pursuance of section six of the act of 1847, which authorizes them employ such agents, clerks and servants as they shall deem necessary for the purposes specified in that act, and to pay a reasonable compensation for their services, out of moneys received by the chamberlain of the city of New York, from the masters and commanders of ships and vessels bringing emigrants to that city.   (Laws of 1847, vol. 1, p. 186.)

The defendants are public officers, and their duties are prescribed by the legislature in the several acts to which I have referred, and by chapter 219 of the Laws of 1848. They were not liable in this case; for they were not guilty of any personal negligence.   The only negligence established

was that of their agents, clerks or servants. And the general rule is now firmly established that public officers and agents are not responsible for the misfeasances, or positive wrongs, or for the nonfeasances, or negligences, or omissions of duty of the sub-agents or servants, or other persons properly employed by and under them, in the discharge of their official duties. (Story on Agency, § 319.) I need not state the qualifications of this rule; for the defendants were not brought within any of them. They may, however, be seen in Story on Agency, sections 319 a, 319 b, and Story on Bailments, section 463.

The position of the defendants is distinguishable from that of persons acting for their own benefit, or employing others for their own benefit. They do not act for their own benefit, or employ agents, clerks or servants for their own benefit, but for the benefit of the community at large.

The case does not show that the defendants receive any compensation for their services. But if they do, the presumption is that the state or city of New York pays them.

My conclusion is that the judge erred in holding the defendants responsible for the carelessness or negligence of their agents or employees, and that the judgment against them was properly reversed and a new trial ordered by the general term of the court of common pleas; and that the order reversing the judgment should be affirmed, and judgment absolute rendered against the plaintiff with costs, pursuant to the stipulation made by her in her notice of appeal to this court.

All the Judges concurring,

                         Judgment accordingly.